IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DARROLD E. WALTERS, | ) | 4:09CV3150 |
| | ) | |
| Plaintiff, | ) | MEMORANDUM AND ORDER ON |
| | ) | REVIEW OF THE FINAL DECISION OF |
| v. | ) | THE COMMISSIONER OF THE SOCIAL |
| | ) | SECURITY ADMINISTRATION |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Now before me is Plaintiff Darrold E. Walters' complaint, filing 1, which is brought pursuant to 42 U.S.C. § 1383(c)(3).  The plaintiff seeks a review of the Commissioner of the Social Security Administration's decision to deny the plaintiff's application for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq.[1]  The defendant has filed an answer to the complaint and a transcript of the administrative record, (see filings 10, 11), and the parties have each filed briefs in support of their positions (see Pl.'s Br., filing 13; Def.'s Br., filing 16; Pl.'s Reply Br., filing 17).  I have carefully reviewed these materials, and I find that the Commissioner's decision must be affirmed.

---

[1]The complaint indicates that it is brought under both 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), (see Compl., filing 1, ¶ 1), and the plaintiff argues in his brief that "[t]his is a proceeding under Title II and Title XVI of the Social Security Act," (see Pl.'s Br., filing 13, at 3). The decision under review states only that the plaintiff made an application for supplemental security income (i.e., a Title XVI application), however, and the record does not appear to include a Title II application.  (See Transcript of Social Security Proceedings at 14.  See also id. at 65 ("Application for Supplemental Security Income").)  The distinction between Title II and Title XVI applications is not significant for the purposes of my review, see House v. Astrue, 500 F.3d 741, 742 n.2 (8th Cir. 2007) ("The same analysis determines disability under Title II and Title XVI."), and I will analyze this case as if it were based solely on a Title XVI application.

## I.   BACKGROUND

It appears that the plaintiff filed an application for SSI benefits on February 9, 2005.  (See Transcript of Social Security Proceedings (hereinafter "Tr.") at 14, 65.)  After the application was denied on initial review, (see id. at 35), and on reconsideration, (see id. at 34, 50-53), the plaintiff requested a hearing before an Administrative Law Judge (ALJ), (id. at 49A).  This hearing was held on July 11, 2007, (see id. at 545), and, in a decision dated January 11, 2008, the ALJ concluded that the plaintiff was not entitled to SSI benefits, (see id. at 14-22).  In reaching this conclusion, the ALJ made the following findings:

1.   The claimant has not engaged in substantial gainful activity since March 2, 2005, the amended alleged onset date (20 CFR 416.920(b) and 416.971 et seq.).

. . . .

2.   The claimant has the following severe impairments: Bipolar disorder; major depression; degenerative joint disease of the cervical spine; acid reflux disease; and history of substance use disorder, in remission since January 2005  (20 CFR 416.920(c)).

. . . .

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

. . . .

4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work, at best.  He can lift or carry 50 pounds occasionally and 25 pounds frequently, and he can sit or stand or walk for six hours in an eight-hour workday.

The claimant should avoid overhead lifting and avoid working with ladders, ropes, or scaffolds.  He can do unskilled, routine, repetitive work with ordinary supervision.  He is limited to brief and superficial interaction with the public, co-workers, and supervisors.

2

. . . .

5.     The claimant is unable to perform any past relevant work (20 CFR 416.965).

. . . .

6.     The claimant was born on March 14, 1959 and was 45 years old, which is defined as a younger individual age 18-49, on his amended alleged onset date (20 CFR 416.963).

7.     The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

. . . .

10.     The claimant has not been under a disability, as defined in the Social Security Act, since March 2, 2005, the amended alleged onset date (20 CFR 416.920(g)).

(Tr. at 16-22.)

     The plaintiff requested that the Appeals Council of the Social Security Administration review the ALJ's decision.  (See Tr. at 10.)  This request was denied, (see id. at 6-9), and therefore the ALJ's decision stands as the final decision of the Commissioner of Social Security.

     On July 16, 2009, the plaintiff filed the instant action.  (See Compl., filing 1.)  The plaintiff asks that I find him "entitled to disability benefits" or "remand the case for a further hearing."  (See id. at 2.)

3

## II.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review is not simply "a rubber stamp for the [Commissioner's] decision and involves more than a search for evidence supporting the [Commissioner's] findings." Tome v. Schweiker, 724 F.2d 711, 713 (8th Cir. 1984). See also Finch, 547 F.3d at 935 (explaining that the court must consider evidence that detracts from the Commissioner's decision in addition to evidence that supports it).

I must also determine whether the Commissioner applied the proper legal standards to arrive at his decision. See Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Nettles v. Schweiker, 714 F.2d 833, 835-36 (8th Cir. 1983). No deference is owed to the Commissioner's legal conclusions. See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

An ALJ is required to follow a five-step sequential analysis to determine whether an individual claimant is disabled. See 20 C.F.R. § 416.920(a). The ALJ continues the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See id. Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful work activity. See 20 C.F.R. § 416.920(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See id. Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 416.920(c). A "severe impairment" is an impairment or a combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." See 20 C.F.R. §

4

416.920(a)(4)(ii), (c); id. § 416.909 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include, inter alia, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921(b). If the claimant cannot prove such an impairment, the ALJ will find that she is not disabled. See 20 C.F.R. § 416.920(a)(4)(ii), (c). Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. See 20 C.F.R. § 416.920(a)(4)(iii), (d). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." See 20 C.F.R. § 416.920(a)(4)(iii). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. See 20 C.F.R. § 416.920(a). Step four requires the ALJ to consider the claimant's residual functional capacity[2] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 416.920(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 416.920(a)(4)(iv), (f). Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past. See 20 C.F.R. § 416.920(a)(4)(v), (g). If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five. See id.

"Through step four of this analysis, the claimant has the burden of showing that she is disabled." Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008). After the analysis reaches step five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the economy that [the] claimant can perform." Id. In this case, the ALJ reached step five of the sequential analysis and concluded that the plaintiff was not disabled. (See Tr. at 27-28.)

---

[2]"'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). See also 20 C.F.R. § 416.945(a).

### III.   SUMMARY OF THE RECORD

At the time of the hearing before the ALJ, the plaintiff was forty-eight years old and held a GED.  (Tr. at 551.)  The parties emphasize the following aspects of the administrative record.  (See Pl.'s Br., filing 13, at 5-7; Def.'s Br., filing 16, at 2-9.)

On January 6, 2005, the plaintiff was admitted to the Good Samaritan Hospital in Kearney, Nebraska, for "[s]uicidal ideas, alcohol abuse, [and] Major Depressive Disorder."  (Tr. at 257.)  The discharge summary states, "The patient did try to kill himself by suffocating himself with carbon monoxide but was unsuccessful."  (Id.)  He stayed in the hospital for twenty days before he was discharged to the Hastings Regional Transitional Program.  (Id.  See also id. at 258-71.)  He received various medications during his hospital stay, and upon discharge he "was no longer suicidal" and "was in early remission from his major depression."  (Id. at 257.)  His Global Assessment of Functioning (GAF) score at discharge was 40.  (Id.)

On January 26, 2005, the plaintiff was admitted to the Hastings Regional Center.  (Tr. at 272.)  His "chief complaint at the time of admission was that he was depressed [and] suicidal," and his "history of abuse, history of chemical abuse, and dependency" were also noted.  (Id.)  His initial diagnoses included "Post Traumatic Stress Disorder," "Major Depression, Moderate, Recurrent," "Alcohol Dependence," "Amphetamine Dependence," and "Cannabis Abuse."  (Id. at 275.)  His GAF score upon admission was 37.  (Id.)  He was discharged on March 2, 2005, with similar diagnoses and a GAF score of 44.  (Id. at 278.)[3]

On March 14, 2005, the plaintiff completed a "Daily Activities and Symptoms Report."  (Tr. at 99.)  On this report, the plaintiff wrote that he cooked lunch and supper, washed dishes, cleaned the house, washed clothes, did "limited snow shoveling," mowed grass in the summer, and walked for about an hour, among other things.  (Id. at 99-100.)  He also wrote that he could stand for 2-3 hours "if allowed to move some," and he could sit for 1-2 hours before he would have to move around.  (Id. at 100.)  He indicated that his "mental health symptoms" improved when he talked with someone about them and when he took medication.  (Id. at 101.)

---

[3]As noted above, March 2, 2005, is also the plaintiff's amended alleged onset date.  (See, e.g., Tr. at 14.)

6

Kent Allison, M.D., examined the plaintiff on April 20, 2005.  (Tr. at 292-97.)  The plaintiff complained of "back problems and neck problems, as well as his hands going numb." (Id. at 292.)  The plaintiff's neck showed decreased range of motion, "crepitus on movement," and "pain on palpitation of the vertebral bodies over the high-thorasic low-cervical area."  (Id. at 295.)  X-rays showed "arthritic changes" in the neck, and Dr. Allison observed that "C7 and T1 have some severe osteoarthritic changes," possible "bony changes," "osteophyte formation," and a loss of intervertebral space.  (Id. at 296.)  Dr. Allison noted good strength in the plaintiff's legs and slightly decreased strength in both hands.  (Id.)  Dr. Allison assessed osteoarthritis of the neck (noting that the plaintiff "is unable to turn his head to the right much at all"); pain in the plaintiff's hands; depression; alcoholism; "bipolar disorder that would go with depression"; and acid reflux disease that was well-controlled by medication.  (Id. at 297.)

On May 4, 2005, the plaintiff was evaluated by Tamara Johnson, M.D., at the Heartland Counseling and Consulting Clinic.  (Tr. at 314-17.)  The plaintiff reported that he was "still having persistent suicidal ideation," although his medication had helped.  (Id. at 314.)  Dr. Johnson's diagnoses included "Bipolar I Disorder, Most Recent Episode Depressed, Severe without Psychotic Features," "Polysubstance Depenence," Posttraumatic Stress Disorder, Chronic," and "Chronic neck pain and GERD."  (Id. at 316)  She assigned a GAF score of 49 and made an adjustment to the plaintiff's medication regimen.  (Id.)

A progress note signed by Tanya Kronhofman, Provisionally Licensed Alcohol Drug Counselor, and dated June 13, 2005, states that the plaintiff reported "feeling less suicidal this week."  (Tr. at 302.)  The plaintiff also reported that he "helped his father mow a couple of lawns over the weekend" and is attending two Alcoholics Anonymous/Narcotics Anonymous meetings per week.  (Id.)

In August 2005, during a series of group and individual sessions with Ms. Kronhofman, the plaintiff reported that he was doing well with his sobriety; that he had enjoyed spending time "tubing down the river" with his family during a weekend; that he was late to a meeting because "he was finishing a spot job that he needed to do for income"; and that he had "a job fixing up houses that he [could] work part time and around his therapy appointments."  (Tr. at 487-89).  He reported to Dr. Johnson that some changes that were made to his treatment "have really been

7

helpful," and Dr. Johnson noted that the plaintiff's mood was stable, his energy was good, and his affect was fine.  (Id. at 538.)  Dr. Johnson also noted that the plaintiff was "chairing nine meetings a week for AA and NA, then he goes to 13 a week."  (Id.)  Dr. Johnson's impression was that the plaintiff's Bipolar Disorder and GERT were "better."  (Id.)

On November 8, 2005, Dr. Johnson noted that the plaintiff was "really doing pretty well" and had "been clean for ten months now."  (Tr. at 537.)  Her impression was that his Bipolar Disorder was "stable" and his GERT was "better," though she also noted that he had been waking up at night with numbness, burning, and tingling in his hands.  (Id.)

From November 2005 through part of January 2006, the plaintiff worked part-time as a custodian at a theater.  (Tr. at 152, 196, 460.)  The record indicates that he worked approximately 28-30 hours per week in this position.  (Id. at 152, 196.)  Beginning in January 2006 and continuing through July 2007, the plaintiff worked part time for a custodial cleaning service.  (Id. at 131-41, 150, 196, 557-58.)  It appears that he worked approximately 8 hours per week in this position.  (E.g., id. at 558.)  In February 2006, the plaintiff reported that he liked his new job and that "his boss is good about not letting him go over in hours which would jeopardize his disability."  (Id. at 457.)  In May 2006, the plaintiff reported that he was doing construction work for his brother-in-law in addition to his custodial work.  (Id. at 438.)  The plaintiff testified that he performed this construction work for about a month and a half.  (Id. at 559-60.)  Also in May 2006, the plaintiff was named "employee of the year" for his custodial work.  (Id. at 434, 436, 558.)  The plaintiff reported in July 2006 that he was "still working" and felt that "his life is going well at this time."  (Id. at 429.)

In August 2006, the plaintiff stated during a group meeting that "his boss is willing to give him more hours at work although he is going to wait due to his disability hearing and child support hearing."  (Tr. at 421.)  He also stated that he had been attending car races with his Narcotics Anonymous peers on weekends.  (Id. at 419.)  In September 2006, the plaintiff reported depression and some difficulty getting out of bed.  (Id. at 418.)  He added that he went to the movies with some of his friends from NA, and they were "thinking of starting a bowling league."  (Id.)

During a group meeting in October 2006, the plaintiff was tearful and disclosed that he

8

was suicidal.  (Tr. at 414.)  Ms. Kronnhofman took him "to the ER so he could get checked into the Behavioral Health Unit for his suicidal thoughts."  (Id.)  On October 9, 2006, he was checked into the Great Plains Regional Medical Center.  (Id. at 337.)  Records indicate that during his hospitalization, the plaintiff "was fairly active on the unit," "participate[d] in groups," and "reported significantly decreased suicidal thinking."  (Id. at 338.)  The plaintiff's GAF score on admission was 25; upon discharge on October 11, 2006, his GAF score was 50.  (Id. at 337.)  Adjustments were made to the plaintiff's medication, and on October 20, 2006, the plaintiff reported that he was "still working and enjoying his job."  (Id. at 412, 532.)

On December 7, 2006, the plaintiff reported to Dr. Johnson that he was "[n]ot nearly as depressed and his sleep is much better."  (Tr. at 531.)  Dr. Johnson opined that the plaintiff's Bipolar Disorder "seems to be better and more stabilized," though his GERD was "still present."  (Id.)

The plaintiff visited Dr. Johnson for a follow-up on February 28, 2007.  (Tr. at 530.)  He reported that his mood was stable, his energy was good, and he was "doing fairly well."  (Id.)  The doctor opined that the plaintiff's Bipolar Disorder was stable.  (Id.)

As noted previously, a hearing was held before an ALJ on July 11, 2007.  (See Tr. at 545.)  During the hearing, the plaintiff testified that his back problem was the main reason that he was not working.  (Id. at 561.)  He also testified that he had not been seeing a doctor about his back.  (Id.)  He testified that his depression "messes with [him] pretty hard," (id.), but he added that his medication helps him "keep from being depressed," (id. at 568).  He also explained that despite his medications, he experiences depression once or twice a week for three or four hours.  (Id. at 568.)  He stated that when he gets depressed, he "kind of isolate[s] [him]self" and tries to meditate and pray to get his mind off whatever was depressing him.  (Id.)

The ALJ asked the plaintiff how he came to receive an award for being employee of the year at Goodwill Industries when he had only worked there for a short period of time.  (Tr. at 565.)  The plaintiff responded that Goodwill Industries was "new in North Platte and they had just a very few people working for them at the time."  (Id.)  The following exchange then occurred:

ALJ:          Well I'm going to take it - - notice of the fact that I've been coming

9

|       |                                                                                 |
|-------|---------------------------------------------------------------------------------|
|       | out here for, at least, 10 years and I've even gone into the Goodwill store, so they've - - |
| CLMT: | No. |
| ALJ: | - - been here 10 years. |
| CLMT: | Goodwill Industries is - - |
| ALJ: | Okay.  Is that something different than Goodwill - - |
| CLMT: | Yes. |
| ALJ: | - - because there is Goodwill collection center drop off points [sic]. |
| CLMT: | Right. |
| ALJ: | I've gone over and talked with them. |
| CLMT: | Right.  This is - - |
| ALJ: | They're here in North Platte for, at least, 10 years. |
| CLMT: | Yeah.  This is a, an employment - - they help disabled people get employment. |
| ALJ: | Mr. Schneider, I think, they've been here quite some time. |
| ATTY: | I can't hear you. |
| ALJ: | I say have - - haven't they been here quite some time? |
| ATTY: | Goodwill has been here, but I, I don't know how long this other service has been here. |
| ALJ: | Okay.  Well interestingly enough I did go over there and just introduce myself and talked to them at one point . . . so I, I don't - - I'm not aware that they just showed up in town - - |
| ATTY: | Well but he - - |
| ALJ: | - - for what it's worth.  Okay. |

10

| | | |
|---|---|---|
| ATTY: | Yeah. | |
| ALJ: | So this is a new program you think . . . that just . . . got started? | |
| CLMT: | [Yes,] - - it's a new program. | |
| ALJ: | Okay.  And because . . . they're new . . . they didn't have anybody else to give any work to except you? | |
| CLMT: | Well there was like three people that worked for them and they said that I was the best worker they had here in North Platt[e], so that's the - - | |
| ALJ: | Okay. | |
| CLMT: | - - reason I got the - - | |
| ALJ: | That's excellent. | |

(Tr. at 565-67.)

Later during the hearing, the ALJ asked a Vocational Expert (VE) the following question:

> First question I have is going to be for medium, unskilled work.  If he could occasionally lift or carry 50 pounds; could stand or along - - occasionally 50 pounds, frequently 25 pounds; could stand, or walk, or sit six hours in an eight hour day there's no problems with his - - with ambulation; should avoid working overhead lifting; and should avoid ladders, ropes, scaffolds - - and then it says due to substance abuse, but he maintains he's not using, so I'm just going to say not work on ladders, ropes, scaffolds; then from a mental standpoint we'd only be looking at unskilled work he is capable of routine, repetitive unskilled work with ordinary supervision; and the social interaction would be brief or superficial with co-workers, general public, and supervisors not constant and not intense.  With that functional capacity, let's see, could he go back - - he really can't go back to any of his past work, so would you identify any Step 5 work that he could perform?

(Tr. at 576.)  The VE responded that there was indeed such work, adding that the plaintiff would probably be able to perform 90% of medium work and the full range of light and sedentary work. (Id. at 576–77.)

The ALJ also asked the VE, "[I]f [the claimant's] testimony is considered to be credible, do you think he could do the type of jobs that you have identified?"  (Tr. at 578.)  The VE replied,

11

> Okay.  With regard to his testimony, no, I don't.  He had indicated that he has problems with 20 pounds of weight repetitively indicating that his hands go numb and he's unable to grip and . . . as far as duration to the time he can do things they were very minimal.

(Id.)

The plaintiff's attorney then asked the VE the following question, and the VE provided the following answer:

> Q     Mr. Leonhardt, if you would assume that the claimant has degenerative disk disease, this chronic back pain, and was severe osteoarthritic, osteoarthritic changes, and major depression, Posttraumatic Stress Disorder, he's bipolar, his, his GAF scores are generally around 50 or below, he's unable to turn his head to the right, he has gastric esophageal reflux disease, in order to treat his depression he has to isolate himself, and that he's - - he has depression on, at least, a third of the time, he has said that his arms go numb when he sits, is a person like that employable on a full-time basis in the national economy?

> A     There . . . are some things in there, the . . . degree I can't comment on, but there are enough that I can comment generally on the question.  The . . . GAF scores - - now that's calling for a medical conclusion; however, on the GAF sheet that . . . shows a 50 or below a person is not able to function in the employment world with . . . those . . . scores.  And isolating with depression a third of the time that would, I can comment on that, that would - - he would not be able to function in the world of work.

(Tr. at 578-79.)

As noted above, on January 11, 2008, the ALJ reached a decision that the plaintiff was not disabled within the meaning of the Social Security Act since March 2, 2005.  (Tr. at 11-22.)

## IV.   ANALYSIS

The plaintiff argues that the Commissioner's decision must be reversed for two reasons: 1) the ALJ's decision was not based on substantial evidence because the question that the ALJ presented to the VE lacked references to the plaintiff's pain and GAF scores; and 2) the ALJ committed prejudicial error by relying on her independent knowledge about Goodwill to discredit

12

the plaintiff's testimony.  (See Pl.'s Br., filing 13, at 8-15; Pl.'s Reply Br., filing 17, at 1-2.)  I shall consider each of the plaintiff's arguments in turn.

### A.   Whether the ALJ Erred by Failing to Include References to Pain and GAF Scores in Her Question to the Vocational Expert

The plaintiff argues, "The answers by the vocational expert to the judge's inadequate hypotheticals, [which left] out reference to pain and low GAF scores, do not constitute substantial evidence upon which the ALJ could base her decision of denial of benefits."  (Pl.'s Br., filing 13, at 11.)  I disagree.

As I noted previously, "[t]he issue at step five is 'whether the claimant is able to perform other work in the national economy in view of [his or] her age, education, and work experience." Guilliams v. Barnhart, 393 F.3d 798, 803-04 (8th Cir. 2005) (quoting Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004)).  In resolving this issue, "[t]he Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to show that jobs that a person with the claimant's RFC can perform exist in significant numbers."  Id. at 804 (citations omitted).  "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'"  Id. (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).  However, "[t]he hypothetical need not 'frame the claimant's impairments in the specific diagnostic terms used in the medical reports, but instead should capture the "concrete consequences" of those impairments.'"  England v. Astrue, 490 F.3d 1017, 1023 (8th Cir. 2007) (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)).

The plaintiff argues first that the ALJ's failure to mention GAF scores in her question to the VE renders her question "legally inadequate."  (Pl.'s Br., filing 13, at 8.)  The record does indicate that the plaintiff's GAF scores ranged from 25 to 50 during certain periods (i.e., when he was suffering from suicidal thoughts, often during his hospitalizations).  It does not follow, however, that the ALJ's failure to include references to these scores renders her question deficient.  See England, 490 F.3d at 1023 (explaining that the hypothetical question need not use "the specific diagnostic terms used in the medical reports").  The issue, rather, is whether the

13

question captures the concrete consequences of the claimant's impairments. See id. In her decision, the ALJ identified the limiting effects of the plaintiff's impairments and explained why "the claimant's statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely credible." (Tr. at 19.) In particular, the ALJ noted that the records showed improvement in the plaintiff's condition and that the plaintiff was working and living independently. (Id.) The ALJ also specifically acknowledged that the plaintiff's GAF "ha[d] been rated in the 25 to 50 range . . . on multiple occasions," but she found that "the record as a whole shows that the claimant's overall condition has steadily improved, possibly because of his abstinence from substance abuse." (Id. at 20.) It seems to me that the ALJ adequately explained why she gave reduced weight to the GAF scores when formulating the plaintiff's RFC. Under the circumstances, I must reject the plaintiffs argument that the ALJ's question to the VE was not properly formulated due to its lack of references to GAF scores.

　　　　The plaintiff also argues that the ALJ's question to the VE was not properly formulated because it lacked references to the plaintiff's pain. I find, however, that the ALJ's question incorporated all of the plaintiff's limitations that were supported by substantial evidence and deemed credible by the ALJ. In discussing the plaintiff's complaints of pain, the ALJ found that the plaintiff's complaints were not entirely credible in light of evidence that he was working as a roofer and as a janitor, that he obtained other jobs from time to time, and that he had received little, if any, treatment for his allegedly disabling back impairment. (Tr. at 19.) The ALJ noted that the plaintiff "uses only aspirin for relief of pain." (Id.) She also noted that the plaintiff's interrogatory responses stated that he could stand for five hours, walk for two hours, and sit for 30 minutes ("on and off") during an eight-hour workday, and that he could lift 50 to 75 pounds with both hands. (Id. at 20.)[4] In short, the ALJ explained why she discredited plaintiff's allegations of disabling pain, and her decision not to incorporate the discredited allegations into her question to the VE was proper. See Guilliams v. Barnhart, 393 F.3d 798, 803-04 (8th Cir. 2005) ("Discredited complaints of pain . . . are properly excluded from a hypothetical question so long as the ALJ had reason to discredit them.").

---

　　　　[4]The ALJ cited Exhibit 12F/6 when discussing the plaintiff's interrogatory responses; in fact, the responses appear in Exhibit 12E/6. (See Tr. at 125.)

In summary, the ALJ explicitly discredited the plaintiff's complaints of disabling pain, and her determination of the plaintiff's RFC was supported by substantial evidence. Indeed, as the defendant correctly notes, (see Def.'s Br., filing 16, at 12 n.2), the plaintiff has not challenged the ALJ's credibility or RFC findings (except as discussed in Part B below). The question that the ALJ presented to the VE was based on the ALJ's RFC assessment and credibility determination, and I find that the question was properly formulated despite the absence of references to disabling pain and GAF scores. I conclude, therefore, that the VE's testimony in response to the ALJ's question constitutes substantial evidence that the plaintiff can perform other work in the national economy in light of his age, education, and work experience.

## B.   Whether the ALJ's Statements About Goodwill Require Remand

The plaintiff submits that, by taking "the position that Goodwill Industries had been in North Platte for a long time," the ALJ "adopted the inference that the claimant was lying about Goodwill being in North Platte for a short time." (Pl.'s Br., filing 13, at 11.) In short, the plaintiff claims that he suffered unfair prejudice due to the ALJ's "reliance on her erroneous 'knowledge'" about Goodwill. (Id. at 14. See also Pl.'s Reply Br., filing 17, at 1-2.)

I agree with the plaintiff that the ALJ relied on her personal knowledge of the ten-year presence of a Goodwill store in North Platte to infer, erroneously, that the plaintiff gave untruthful testimony about the recent arrival of Goodwill Industries in North Platte. (See Tr. at 565-67.) It seems to me, however, that this inference dissolved during the course of the ALJ's questioning of the plaintiff. Near the end of their discussion of this point, the ALJ asked the plaintiff, "So this is a new program you think . . . that just . . . got started?" (Id. at 567.) After the plaintiff responded in the affirmative, the ALJ replied, "Okay." (Id.) The ALJ also replied, "That's excellent," in response to the plaintiff's final description of the circumstances of his employee of the year award. (See id.) Perhaps more importantly, the ALJ's decision credits the plaintiff with having obtained "a Worker of the Year award from Goodwill Industries," (id. at 17), and there is no indication that the ALJ discredited the plaintiff's testimony based on her personal beliefs about the length of Goodwill's presence in North Platte, (see id. at 14-22).

15

Instead, as discussed above, the ALJ provided other reasons for discrediting the plaintiff's statements about the intensity, persistence, and limiting effects of his impairments.  (<u>See</u> <u>id.</u> at 18-20.)  Under these circumstances, a remand is not warranted.

      **IT IS ORDERED** that the Commissioner of Social Security's decision is affirmed.

Dated March 29, 2010.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge